**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**PETER D. TODD**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANGELA N. SANCHEZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

MACK A. SIMS,                                      )
                                                   )
    Appellant-Petitioner,                     )
                                                   )
        vs.                            )    No. 20A03-1210-PC-431
                                                   )
STATE OF INDIANA,                                  )
                                                   )
    Appellee-Respondent.                      )

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Evan S. Roberts, Judge
Cause No. 20D01-1108-PC-5

**July 15, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

Mack A. Sims was convicted of attempted murder for shooting Shane Carey at close range through his car window. Eighteen years later, he filed a petition for post-conviction relief, claiming that the outcome of his trial was materially affected by the State's failure to disclose the fact that, prior to trial, Carey had undergone hypnosis. The post-conviction court denied his petition, and he now appeals. Because we conclude that the findings of fact and the record as a whole support the post-conviction court's determination that the State's nondisclosure did not materially affect the outcome of Sims's trial, we affirm.

## Facts and Procedural History

On the evening of November 2, 1993, Shane Carey was working security for an adult education center in Elkhart. As he sat in the parking lot inside his vehicle, Sims and two other men approached. Sims stood just outside Carey's driver's side window, and Carey looked him "square in the eyes." Tr. at 225. Sims shot Carey through the window, striking him in the face. Shortly thereafter, police arrived on the scene, and Carey gave them a description of his assailant: a black male in his late twenties with a large build, short hair, and wearing a dark three-quarter length leather coat, dark pants, and boots. Moments later, police found Sims crouching behind a nearby dumpster. His clothing and physical traits matched the description provided by Carey, so police took him to the precinct for questioning. Meanwhile, Carey was transported to a nearby hospital.

When police arrived at the hospital emergency room, they showed Carey photos of Sims and several other men, and Carey positively identified Sims as his assailant. Two days

2

later, Carey again identified Sims from a photo array. Carey identified Sims a third time when presented with a photo array at the prosecutor's office.

The State charged Sims with class A felony attempted murder. In the intervening months between Carey's release from the hospital and Sims's jury trial, Carey underwent a single session of hypnosis in order to sharpen his recollection concerning the shooting. The State arranged and paid for the hypnosis session, but never disclosed it to the defense or the trial court. During Sims's trial, Carey positively identified Sims as his assailant. Included in the trial court record was evidence of Carey's previous identifications of Sims as well as police testimony concerning their apprehension of Sims based on the description provided by Carey. On December 1, 1994, the jury convicted Sims as charged, and the trial court subsequently sentenced him to thirty-five years. In August 1996, another panel of this Court affirmed his conviction. *Sims v. State*, No. 20A04-9510-CR-398 (Ind. Ct. App. Aug. 9, 1996), *trans. denied*.

In May 2012, Sims filed an amended petition for post-conviction relief, claiming that the State had failed to disclose exculpatory evidence, which he cited as newly-discovered evidence. In his post-conviction petition, Sims claimed that the victim Carey, the only eyewitness to the shooting, had provided tainted, inadmissible testimony based on the State's failure to disclose that Carey had undergone one hypnosis session in the months leading up to trial.

The post-conviction court held a hearing and took witness testimony on the issue of whether Carey was sufficiently able to identify Sims before he underwent hypnosis. Sims

cited a conversation between the chief prosecutor and a deputy prosecutor in which the chief commented to the deputy that Carey was able to identify Sims only after the hypnosis. The chief prosecutor testified that Carey was able to identify Sims before undergoing hypnosis but that the hypnosis simply made him more certain about his previous identifications of Sims. He also indicated that at the time he made the comment to the deputy prosecutor, he had not yet familiarized himself with Sims's case. The investigating police lieutenant testified that, from the beginning, Carey could identify his assailant and that Carey's descriptions matched Sims's physical description. The post-conviction record also contains evidence of Carey's pre-hypnotic identifications of Sims through photo lineups/arrays.

Following the hearing, the post-conviction court denied Sims's petition, concluding that while the State failed to disclose evidence favorable to the defense, the undisclosed evidence is not material because it is not reasonably probable that disclosure would have changed the result of Sims's jury trial. This appeal ensued. Additional facts will be provided as necessary.

## Discussion and Decision

Sims contends that the post-conviction court erred in denying his petition for post-conviction relief. The petitioner in a post-conviction proceeding "has the burden of establishing grounds for relief by a preponderance of the evidence." Ind. Post-Conviction Rule 1(5); *Brown v. State*, 880 N.E.2d 1226, 1229 (Ind. Ct. App. 2008), *trans. denied*. When issuing its decision to grant or deny relief, the post-conviction court must make findings of fact and conclusions of law. Ind. Post-Conviction Rule 1(6). A petitioner who

appeals the denial of his post-conviction petition faces a rigorous standard of review. *Massey v. State*, 955 N.E.2d 247, 253 (Ind. 2011). In conducting our review, we neither reweigh evidence nor judge witness credibility; rather, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Brown*, 880 N.E.2d at 1230 (citation and quotation marks omitted). In other words, if a post-conviction petitioner was denied relief in the proceedings below, he must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite the one reached by the post-conviction court. *Massey*, 955 N.E.2d at 253.

The post-conviction court's findings of fact state in part,

6. On August 9, 1996, the Indiana Court of Appeals affirmed Petitioner's conviction holding, "Even if an improper exhibition of a single photograph of Sims took place, given the totality of these circumstances we find that there was a sufficient basis independent of the improper photo display to support the admissibility of the in-court identification of Sims …;"

….

9. On 5/10/2012, Petitioner, with the assistance of counsel, filed an Amended Petition for Post-Conviction Relief which added two grounds for relief:; (1) The State of Indiana failed to disclose exculpatory evidence and (2) The aforementioned evidence was "newly discovered evidence." This Order addresses these claims;

….

11. On 2/8/2012, it was revealed by Deputy Prosecuting Attorney Graham Polando in the course of the Post-Conviction proceedings that Shane Carey (hereafter "Carey"), the State's only eyewitness, was hypnotized prior to his in-court identification at the jury trial. There is no dispute that Petitioner was

5

not made aware of the hypnosis until it was disclosed by DPA Polando, after Petitioner had finished his sentence in D193CF104, in the course of the proceedings related to this Petition;

12.     There is no dispute that Carey had been hypnotized at the suggestion of Deputy Prosecuting Attorney (now Judge) Charles Wicks, prior to his testimony in the 1994 jury trial.  The court therefore finds that such hypnosis did in fact occur;

13.     The Court determines that the hypnosis was never disclosed.  There is no argument that then Prosecutor Wicks did not disclose this hypnosis to Petitioner, Petitioner's trial counsel … or Petitioner's appellate counsel … ;

14.     At the jury trial, the State presented evidence that Carey was shot by a man with a distinctive face discoloration, wearing a dark-colored, likely black three-quarter length jacket, and dark pants.  The description was given as testimony by officers who first responded to the scene and who spoke to Carey before he was taken to the hospital.  At the hospital, Carey was presented with a lineup of pictures, and he chose Petitioner's picture;

15.     The real dispute is to whether Carey was able to sufficiently identify Petitioner *before* hypnosis.  Petitioner points to then Prosecutor Wicks' statement:  that Carey was "only" able to identify Petitioner after the hypnosis.  Prosecutor Wicks, however, testified during the post-conviction hearing that Carey simply became more certain in his identification following hypnosis;

16.     At the post-conviction hearing, Carey testified that the hypnosis did indeed have some effect on his ability to recall the event, which the Court finds accords with the evidence;

17.     The Court finds that there is reason to doubt then Prosecutor Wicks' original statement that Carey was "only" able to identify Petitioner following the hypnosis.  Prosecutor Wicks testified that he had not had time to consider the case before speaking with DPA Polando, but that he had consulted his notes and considered the case in preparation for his testimony at the evidentiary hearing.  His sworn testimony, then is more credible than his remark to Mr. Polando following an informal conversation about the case;

18.     The Court further notes that the contention that Carey was "only" able to identify Petitioner following the hypnosis is at odds with other credible evidence as noted in the record.  Lieutenant Tom Lerner with the Elkhart Police Department testified at the jury trial that, from the very beginning,

6

Carey said he could identify his assailant, and that his description of that assailant matched Petitioner. And, the Indiana Court of Appeals noted that at the hospital later on the evening of the shooting, Carey was shown six or seven photographs, including one of Sims taken after Sims was apprehended. Carey identified Sims's photograph as a picture of his assailant." This initial identification occurred *well before* hypnosis—which was confirmed through the testimony at the post-conviction hearing;

19.      From the record of the case, Carey was able to identify Petitioner well before hypnosis.

Appellant's App. at 9-12.

Sims challenges the post-conviction court's findings and conclusions with respect to the State's failure to disclose that the sole eyewitness had undergone hypnosis and the admissibility of the eyewitness's testimony. With respect to the State's failure to disclose the fact that eyewitness Carey had undergone hypnosis prior to his in-court identification of Sims, we note that the State has an affirmative duty to disclose material evidence favorable to the defendant. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

To prevail on a *Brady* claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial. Evidence is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

*State v. Hollin*, 970 N.E.2d 147, 153 (Ind. 2012) (citations and internal quotation marks omitted).

Evidence derived from a hypnotically entranced witness is inherently unreliable as not having probative value and is therefore inadmissible. *Rowley v. State*, 483 N.E.2d 1078, 1081 (Ind. 1985). "Such evidence should be excluded because hypnotically induced

7

evidence is affected by confabulation, a process whereby the hypnotic subject fills in memory gaps with fantasy. The post-hypnotic subject is confident that any memory recalled is accurate and factually based, a conviction which cannot be tested through cross-examination." *Id.* Thus, the State must demonstrate by clear and convincing evidence that the witness's "in-court identification has a factual basis independent of the hypnotic session." *Id.* In determining whether there is an independent basis for the witness's identification of the defendant, major factors include the witness's opportunity to observe the defendant and the reliability of his original, pre-hypnotic recollections and observations vis-à-vis the defendant. *Id.* Also important in determining an independent factual basis, free from the taint of hypnotic suggestion, is the level of consistency between the witness's pre- and post-hypnotic statements. *Peterson v. State*, 514 N.E.2d 265, 270 (Ind. 1987).

Here, the post-conviction court concluded that the State failed to disclose Carey's hypnosis and that such evidence would have been favorable to Sims. Nevertheless, the court concluded that the evidence was not material and that the result of proceeding would not have been different if Carey's hypnosis had been disclosed, stating in pertinent part,

> 7. In this case, the State has proven that Carey could sufficiently identify his assailant prior to hypnosis. Carey noticed men walking around while he was reading his book that evening. He observed the Defendant in fair, outside lighting, who walked up to the side of his vehicle, stared at him and shot him. Carey gave a description of Defendant immediately after being shot and walking inside the school opposite for help. This description was sufficient for officers to begin searching for the culprit. Defendant was found near the scene of the crime, observing police officers. An officer identified Defendant as a suspect from the description given by Carey, relying on the three-quarter length black jacket, presented in court. After Carey was taken to the hospital, he was presented with a picture lineup, from which he identified Defendant. *Carey never identified any other as his assailant, and he was able to write a*

8

*three page statement on the event. ….* This is a sufficient independent basis for the in-court identification;

8. Further, although Carey admits his testimony was influenced by the hypnosis, Carey's description did not substantially change from before to after the hypnosis, and the discrepancies were fully discussed and tested by opposing counsel; the sole additions/changes were hair, a cap/hood, the particular color of the jacket, and more particularities on Petitioner's face. Carey's original description, as testified to by Officer Lerner at the jury trial, was "a black male, large in build with short or shaved head; described as wearing a three-quarter-length, what appeared to be black, leather jacket or coat, dark-colored pants, late twenties possibly." On cross he stated that he did not recall Carey mentioning footwear or a cap at the initial identification. In Carey's own cross he acknowledged that his initial statement to police included "black boots," which, in court, he described as combat boots. It also did not include a hood or a patch on the jacket, which he testified to in court. He also acknowledged that the discoloration on Defendant's face was not in his initial statement to police. Carey himself stated, "The information that I gave in the emergency room is the best, especially when the police first arrive at the scene. When the police first arrived at the scene, I rattled off what I saw." These minor changes in Carey's testimony were fully developed, examined and vigorously discussed in cross examination and the jury had the ability to weigh Carey's credibility regarding the differences;

9. The evidence presented provides sufficient confidence in the verdict. The record reveals that Carey was able to identify Defendant before hypnosis. Thus the Court finds that the hypnosis disclosure would not have changed the outcome, and its nondisclosure did not amount to a Brady violation.

Appellant's App. at 13-14.

The record supports the trial court's findings and conclusions with respect to the immateriality of the undisclosed hypnosis. Carey testified that at the time of the shooting, he looked directly into the face and eyes of his assailant. P-CR Tr. at 66; Tr. at 224-26, 270. He described his assailant's clothing and physical characteristics to police, who apprehended Sims near the scene shortly thereafter and found his clothing and physical appearance to be consistent with Carey's description. He identified Sims three times through photo

9

lineups/arrays shortly after the incident and before he underwent hypnosis. Although the State's nondisclosure meant that Carey was not specifically cross-examined concerning his hypnosis, he was subjected to vigorous cross-examination regarding his numerous identifications of Sims. During the post-conviction proceedings, the essence of Carey's testimony was that he remembered his assailant's appearance when he identified him by photo just after the shooting but that the hypnosis had helped him to be "extremely sure." P-CR Tr. at 60-61. To the extent that Sims now cites discrepancies in how specifically Carey described Sims's clothing or certain physical traits in his pre- and post-hypnotic identifications,[1] he invites us to reweigh evidence, which we may not do. Simply put, Carey's numerous pre-hypnotic descriptions and identifications of Sims are sufficient to establish an independent basis for his post-hypnotic in-court identification.

Based on the foregoing, we conclude that the findings of fact and the record as a whole support the post-conviction court's determination that it is not reasonably probable that the outcome of Sims's trial would have been different had Carey's hypnosis been disclosed. Thus, Sims has failed to demonstrate that the post-conviction court clearly erred in denying his petition for post-conviction relief. Accordingly, we affirm.

Affirmed.

ROBB, C.J., and FRIEDLANDER, J., concur.

---

[1] For example, Sims has a distinctive birthmark on his face. Carey did not include it in his initial description to police. However, Carey later testified that he had noticed the facial marking from the time of the shooting but that it really "stood out" after hypnosis. P-CR Tr. at 66.